**AIR–SHIELDS, INC. and Children's Hospital of Philadelphia, Plaintiffs,**

v.

**AIR REDUCTION COMPANY, Incorporated, Defendant.**

**No. 67 C 1767.**

United States District Court,
N. D. Illinois, E. D.
March 18, 1971.

See also, D.C., 46 F.R.D. 96.

Clyde F. Willian, Patrick H. Hume, Hume, Clement, Hume & Lee, Chicago, Ill., John T. Synnestvedt, Synnestvedt & Lechner, Philadelphia, Pa., for plaintiffs.

David L. Ladd, Theodore R. Scott, Dugald S. McDougall, McDougall, Hersh, Scott & Ladd, Chicago, Ill., H. Hume Mathews, Murray Hill, N. J., Air Reduction, for defendant.

NAPOLI, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause coming on for trial on the merits of the complaint, amended answer and counter-claim, and reply to the amended counter-claim, the Court having heard the evidence, having considered the memoranda of counsel for the parties and being fully advised in the premises, now finds:

## FINDINGS OF FACT

1. By this action, plaintiff seeks damages and injunctive relief for alleged infringement by the defendant of U. S. patents Nos. 2,600,240, 2,648,327, 2,778,-617, 3,335,713, and 3,338,233. (For convenient reference, those patents are usually referred to hereinafter by their three terminal digits.) The Court has jurisdiction over the subject matter of the action by virtue of United States Code, Title 28, § 1338(a), and the propriety of the venue is conceded.

2. Plaintiff Air-Shields, Inc. (hereinafter "Air-Shields") is a Delaware corporation having its principal place of business at Hatboro, Pennsylvania. It is a wholly owned subsidiary of Narco Scientific Industries, Inc. Plaintiff Children's Hospital of Philadelphia (hereinafter "Children's Hospital") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. It is a party plaintiff only by virtue of its having legal title to the '240 and '327 patents in suit, plaintiff Air-Shields having been exclusive licensee under those patents at all times relevant to this action. Plaintiff Air-Shields is the sole owner of the other patents in suit-to-wit, '617, '713 and '233.

3. Defendant Air Reduction Company, Incorporated is a New York corporation. The division of defendant involved in this action is the Ohio Medical Products Division (formerly known as Ohio Chemical & Surgical Equipment Co. Division). The principal place of business of that division is at Madison, Wisconsin, but it also has a regular and established place of business in Chicago, Illinois, from which it has sold the products herein accused of infringement. For convenient reference, the defendant hereinafter is usually called "Ohio".

4. Air-Shields and Ohio are competitors in the infant-incubator business. Four of the five patents in suit relate directly to infant incubators, and the other one—No. '617—describes and claims a so-called "nebulizer", useful as an incubator accessory.

5. The claims of the patents in suit which are alleged to have been infringed are:

| Patent No. | Claims in Suit |
|---|---|
| 2,600,240 | 2, 4, 5, 8, 10 and 12 |
| 2,648,327 | 6, 8 and 10 |
| 2,778,617 | 1 and 6 |
| 3,335,713 | 13, 14 and 16 |
| 3,338,233 | 5, 7, 8, 9, 10, 11 and 12 |

6. The four models of Ohio incubators charged with infringement are respectively designated Models 188, 190, 190–A, and 190–A SC. All the claims in suit of the '240 and '327 patents are asserted against all four Ohio models. The claims in suit of the '713 patent are asserted only against the 190–A and 190–A SC models. The '233 claims in suit are asserted only against Ohio's Model 190–A SC. The '617 claims in suit are alleged to be infringed by two different types of "nebulizers" which Ohio has sold, respectively designated "Model G" and "Deluxe Model".

7. Defendant Ohio contends that all the asserted claims of the patents in suit are invalid for lack of invention over the prior art, it denies infringement of a number of the claims asserted, it pleads that enforcement of the '240, '327, and '617 patents is barred by laches, it pleads that certain claims are barred by 35 U.S.Code, § 102(b) by reason of prior public use and sale of their subject matter, and it further pleads that plaintiffs should be denied any relief in this action because Air-Shields' hands are un-

clean. Also, in reliance on 35 U.S.Code § 285, Ohio seeks judgment against Air-Shields for a portion of its attorneys' fees, on the ground that it is an "exceptional case" by reason of Air-Shields' inequitable conduct in securing and attempting to enforce certain of the claims in suit.

8. The original infant incubators—dating back at least to 1893 (535)—were the type now known as "non-isolation incubators". They consisted essentially of an enclosed crib provided with a means for heating, and in some cases humidifying, the air supplied to it. Such a device afforded a baby an enclosed living space in which the temperature and humidity were controlled, but it did not isolate the infant from the nursery environment, for there was a continuous flow of air from the nursery into the incubator and out again into the nursery. (Non-isolation incubators had no forced air draft; they depended for ventilation on the natural convection that resulted from heating the incoming air.) While non-isolation incubators are still used in hospitals for non-critical purposes such as post-operative care of full-term babies, they are not normally used in the care and treatment of premature infants, having been supplanted in that field of use by the so-called "isolation incubator" (536–539).

9. The isolation incubator, universally used today in caring for premature babies, has been aptly called a "Room within a Room", providing "Individual Air-Conditioning for Each Patient" (DX D, p. 3). The baby compartment of such an incubator is supplied, by associated air-conditioning machinery, with a continuous flow of recirculated air, accurately controlled as to temperature, humidity, and oxygen content. Enough fresh air to replace the carbon dioxide generated by the baby's breathing is brought in through a filter, and the air pressure in the baby's chamber is maintained slightly above atmospheric, so that air leaks out of the baby chamber and into the adjoining nursery, rather than vice versa. Thus is the baby effectively protected against infection from his environment (476–479).

10. The isolation incubator, just described, was invented in the 1930's by a Philadelphia physician named Charles C. Chapple. In 1938 Dr. Chapple's invention was written up in the medical literature (DX A, Tab 31), and Chapple incubators promptly went into use in such famous medical research centers as Boston Lying-In Hospital, Harvard Medical School, New York University, and John Hopkins University. The Chapple incubator was widely hailed by the medical profession as a major contribution to infant care, and by 1946 it had made Dr. Chapple a famous man (246, 723–725).

11. Dr. Chapple took out a patent on his isolation incubator (No. 2,243,999, DX A, Tab 9), and assigned it to Children's Hospital of Philadelphia. In 1946, just after the end of World War II, Dr. Chapple approached Samuel Gibbon, president of Air-Shields, and asked if Air-Shields would be interested in manufacturing the Chapple incubator (105). After examining pre-war vintage Chapple incubators in a number of hospitals, Gibbon decided to accept Dr. Chapple's proposal (108–121). Air-Shields acquired an exclusive license under the Chapple patent, consulted Dr. Chapple and other leading pediatricians with respect to what the performance specifications should be, and undertook to re-engineer the Chapple incubator for quantity production (121–122). That work was done primarily by B. C. Grieb, then Air-Shields' general manager (122).

12. Somewhat more than a year later, Air-Shields marketed its first Chapple incubator, designated model C–33 (126, 128–129). A considerable number of them were manufactured and sold, but Air-Shields was never able to secure Underwriters Laboratories approval for the C–33 for the reason, Air-Shields was told, that the Laboratories considered it unsafe for use with oxygen because of its exposed electrical connections in the machinery compartment (129–131).

(That original Air-Shields incubator Model C-33 is the one shown and described in the '240 patent in suit (PX 1).)

13. Convinced that Underwriters' approval could not be obtained without a major redesign of the C-33 incubator, the Air-Shields management in 1948 did undertake that task; and the reworked unit, under the designation C-35, was granted Underwriters' approval and became a regular item of commercial production by Air-Shields (132, 136-137, 153-154). (In the C-35, the electrical connections and components, in conformity with established safety standards, were put in a sealed box out of contact with oxygen-enriched air.) The Model C-35 incubator is shown and described in the '327 patent in suit, taken out by Air-Shields in the name of Samuel Gibbon, its president (PX 2).

14. In addition to manufacturing infant incubators, Air-Shields by 1950 was selling a humidity and oxygen tent, under the trade name "Croupette". Air-Shields secured patent No. 2,624,337 on that unit, in Samuel Gibbon's name (DX A, Tab 15). The Croupette included a "nebulizer"—i. e., vaporizing unit—by means of which air was drawn out of the oxygen tent, humidified by a fine spray from an atomizer, and recirculated through the tent. The inlet and outlet ports of that Croupette nebulizer were disposed in a vertical plane, the discharge port being directly above the inlet port (341-350).

15. Some time after the Croupette unit went into production by Air-Shields, some pediatricians expressed an interest in having a nebulizer unit adaptable for use with the infant incubators then being sold by Air-Shields. To that end, Air-Shields modified the Croupette nebulizer by placing the inlet and discharge ports side by side and equipping them with spring clips, to snap into a pair of holes already present in the side wall of the incubator hood. On this modification Air-Shields took out the nebulizer patent in suit No. 2,778,617 (350-358, 3136-3137).

16. During the late 1940's and early 1950's, in the course of which the events just recounted took place at Air-Shields, defendant Ohio's predecessor in the incubator business, The Gordon Armstrong Company of Cleveland, Ohio (hereinafter called "Armstrong"), was selling a line of non-isolation type units (109-112), one of which was known as the Armstrong X-4 incubator. (That incubator is illustrated in Armstrong patent No. 2,417,962, DX A, Tab 13.) While the X-4 unit was not an incubator of the isolation type, and did not contain either a motor or fan, it did utilize electricity both for heating and lights; and it was so constructed, in the interest of safety, that the heating element, the control switches, and all wiring connections were completely sealed off from access to oxygen-enriched air (252, 276-292, 2193-2196). The Armstrong X-4 incubator unit did have Underwriters Laboratories approval (253).

17. Throughout the entire life of Dr. Chapple's isolation-incubator patent (No. 2,243,999, DX A, Tab 9), the Armstrong company respected it; it was only in the fall of 1959, after the Chapple patent had expired, that the first Armstrong isolation incubator (known as Model 188) was announced to the trade (699-700, 935).

18. During the middle 1950's Air-Shields resented Armstrong's competition, even though Armstrong was then selling only incubators of the non-isolation type (DX E, p. 9); and in 1958 Air-Shields and Children's Hospital sued Armstrong, in the United States District Court for the Northern District of Ohio (312-313), alleging infringement of the Chapple patent No. 2,243,999 and four other patents, including patent No. 2,-600,240 here in suit. The case was tried and decided in favor of Armstrong, the Chapple patent being held non-infringed and the other four patents invalid as to all claims in suit (DX SS, pages 70-73).

19. Shortly after the expiration of the Chapple patent, the Armstrong company, as already noted, announced that it would market an isolation incubator,

designated Model 188. Representatives of Air-Shields saw a prototype of that new incubator at a medical meeting in the fall of 1959, and in May, 1961, Air-Shields bought and inspected one (887). Up to that time no American manufacturer other than Air-Shields had ever marketed an isolation incubator and imports were negligible, so that Air-Shields, when Armstrong's Model 188 first appeared, had essentially 100% of the isolation-incubator business in this country (1006–1007).

20. Air-Shields consulted counsel and was advised at least as early as May 8, 1961, that the Armstrong Model 188 did infringe some Air-Shields patents (888, (DX O). The question whether to file suit against Armstrong was thereupon given serious consideration by Air-Shields (888). In August 1961, Air-Shields learned that Armstrong had been acquired by defendant Ohio. (898, 935–940, 960–961). In December, 1961, and January, 1962, the Air-Shields sales department reported that the new Armstrong incubator was hurting Air-Shields' sales (DX M, F; 935–940).

21. Repeatedly between May and December of 1961, Air-Shields was warned by its patent counsel that legal action against the new Armstrong incubator, if taken at all, should be started promptly, lest Air-Shields' rights be lost by delay (DX M, N, O, QQ–1–3). Air-Shields' counsel was not enthusiastic about filing suit, however (DX M, 966), advising that "it is not a very attractive case of infringement" because the "two units look different and do not perform in the same manner". Anent the possibility of giving notice of infringement to Ohio, Air-Shields' counsel told his client (966) that if Ohio were notified of infringement, "there would be no guarantee they would not bring suit against us". (DX M, N, O, QQ–1–3).

22. By management decision Air-Shields took no legal action in 1959, 1960, or 1961 against either the Armstrong company or its successor Ohio, and intentionally refrained throughout that period from giving any notice of infringement to either company (887–893). The same policy was consciously pursued throughout 1962, 1963, 1964, 1965, 1966, and until August of 1967—that is, through a period of eight years from Air-Shields' first knowledge of the Model 188 incubator and more than six years after Air-Shields had actually purchased such an incubator and inspected it in detail (935–936). During that same period, Air-Shields instituted, and prosecuted to out-of-court settlements, a series of infringement suits against companies believed to be infringing an Air-Shields patent on a resuscitator (940–944, 987). The sales of that resuscitator constituted about 10% of Air-Shields' total business, whereas in the period involved the incubator and nebulizer business accounted for about 45% of Air-Shields' sales volume (943–944).

23. In the fall of 1958, a noted pediatrician named Dr. William Silverman, renowned for several important contributions to the science of treating premature infants (458–466, 701–710), released to the press (DX A, Tab 36) information concerning so-called "servo control" infant incubators which he had developed with the help of technical advisers at Columbia University (707–710). Those incubators had the feature that the baby occupants themselves, by means of a sensor taped to their abdomens, "acted as their own thermostats". That is, the heat source was controlled by electric signals from the abdominal unit, being turned on whenever the baby's temperature dropped below the desired value and being turned off the instant the baby's temperature rose above that value (DX A Tabs 36, 37, 42).

24. In Dr. Silverman's "servo control" incubators, an auxiliary radiant-energy heater was provided; under the control of the abdominal sensor, it supplemented the heat provided by the regular incubator air heater. After satisfying himself that his servo-control incubators could maintain an infant's body temperature with a higher degree of pre-

cision than was previously possible, Dr. Silverman called upon Air-Shields to engineer the units for mass production (551–553, 735–736). Air-Shields put an engineer on that job, and in due course a servo-control infant incubator having a radiant-energy auxiliary heat source was brought out as a regular Air-Shields product. Those incubators were expensive, however, and before long were superseded by a servo-control model in which the regular incubator air heater was turned on and off by signals from the abdominal sensor, the radiant-energy heater being dispensed with (555–560; 736–737). This last mentioned type of Air-Shields servo-control incubator was known as the Model C–86 IC; it appeared in two versions, the later of which was still in production at the time of trial (855–867, 992–997).

25. The '713 patent in suit (PX 4), applied for in November of 1963 and issued on August 15, 1967, discloses the mechanical features of the present day Air-Shields incubator Model C–86. It also discloses one of Air-Shields' early servo-control arrangements (859), but its claims relate to structural details of the incubator rather than to servo control. The '233 patent in suit (PX 5) does relate to servo control; it discloses and claims the circuit used in the current Air-Shields servo-control model (859).

26. During the early years of Air-Shields' activities with servo-control incubators, it had no competition in that field from Ohio. In December of 1964 Ohio undertook to develop a servo-control unit for its incubators. This project led ultimately to a control circuit which "modulated" the heat output from the incubator air heater in response to signals from the occupant's body-temperature sensor, rather than just turning the heater on or off as the Air-Shields servo-control unit did (752–753; PX 325, Chart 7). The first Ohio incubator with that new heat-modulating servo controller was sold and shipped on October 12, 1966 (2065), under the model designation 190–A SC; such incubators have been in the Ohio product line ever since.

Years later Air-Shields set out to produce a heat-modulating type of servo control, devoted "considerable development" to the project, and placed it on public display while the trial of this cause was in progress (2918–2920).

27. At the time Ohio acquired the business of the Armstrong Company in 1961, Ohio secured from Armstrong an indemnity against infringement liability, plus assurance that no patent problems such as charges of infringement, were then in existence. This Ohio accepted, due note having been taken of the fact that Armstrong had won a complete victory in the infringement suit brought against it by Air-Shields in the 1950's (2005–2011; 2745–2747; PX 293–298; DX DDD). Thereafter, on each occasion on which a new product was added to Ohio's incubator line or an old product redesigned, defendant's patent department made a careful study to determine whether the proposed new product or redesign would infringe valid patents held by others. In each instance the new product or redesign was marketed only after it had been granted patent clearance (2733–2745; 2033–2042). It is Ohio's practice to acquire a license and pay royalties whenever, in the opinion of defendant's patent department, an Ohio product is covered by a valid patent held by someone else (2042–2049; 2745). In the specific case of the Ohio incubators in current production, namely Models 190–A and 190–A SC, careful investigations by defendant's patent department indicated that there were no existing patents even purporting to cover the features first introduced in those models. (At the time those models were first marketed, neither the '713 nor the '233 patents in suit had issued.) In recognition that there might be pending applications directed to one or more of the new features in question, defendant's patent department included in its patent study a prior-art search, on the basis of which it advised Ohio that the newly added features of models 190–A and 190–A SC were in the public domain and hence available for everyone to use

(2703, 2757–2780; DX ZZ, EEE; PX 210, 288–292, A284).

28. Taking into account the original purchase price of the Armstrong company and its assets, plus expenditures made after the Armstrong acquisition for plant expansion, engineering development, tooling, and promotion, defendant Ohio invested in its infant-incubator business, between 1961 and 1967, a sum estimated to be in the neighborhood of $1,000,000 (2015–2020).

29. In attempting to excuse Air-Shields' failure to give Ohio any notice of infringement between 1961 and 1967, Edward E. Muriot, the Board Chairman of Air-Shields, testified that no one in the Air-Shields organization, to his knowledge was even acquainted with anyone at Ohio during the period prior to August, 1967, when Ohio was first notified of Air-Shields' infringement charges (DX RR, 1027–1030). It appears, however, that Mr. Muriot was misinformed or, perhaps, made no real effort to learn whether Air-Shields' people knew anyone in the Ohio management. Edward F. Fullwood, Ohio's Vice-President of Development and Engineering, has known Samuel Gibbon, Air-Shields' founder and former president, since a date at least as early as Ohio's acquisition of the Armstrong company. Through the same period of years, he has been personally acquainted with Dr. Harry Cullumbine, Gibbon's successor as Air-Shields' president, and with Chris Andreasen, Air-Shields' technical director. Fullwood served on industry committees with Air-Shields people in the early 1960's (2021–2024); about 1960, he negotiated with Samuel Gibbon an agreement under which Air-Shields took a license under an Ohio-owned patent (2027–2030). Notwithstanding all those direct personal relationships, however, no one at Air-Shields ever said anything to Fullwood even suggesting that Ohio was infringing on Air-Shields' patent rights (2026–2027).

## THE '240 PATENT IN SUIT.

30. The '240 patent in suit (PX 1) was taken out in the name of B. C. Grieb, Air-Shields' general manager at the time the company undertook to redesign and market the Chapple incubator. The claims in suit—Nos. 2, 4, 5, 8, 10, and 12—all relate to the mechanical arrangement of the incubator parts.

31. Claim 2 of the '240 patent calls for an infant incubator in which the fan, heater, and humidifier are enclosed in a "base unit" having an upper surface that forms the floor of the enclosed occupant's space and provided with air inlet and exhaust passages. The claim defines nothing either novel or inventive. The incubator of claim 2 is like the original Chapple incubator but for trivial, obvious distinctions, such as having the heater in the base unit rather than in the baby compartment (DX A, Tab 9; 2177–2178). The claim language reads literally word for word on the incubator disclosed in the prior-art Taylor patent (DX A, Tab 10; 2178–2189).

32. Claim 2 of '240 does not "read" on the accused Ohio incubators, for claim 2 requires an incubator construction in which the operating machinery is enclosed in a "base unit" having "an upper surface" forming the "floor" of the occupant's space. This aptly describes the Air-Shields incubator shown in the '240 patent, but it does not describe the Ohio incubators, which have no enclosed base unit (805–808). The Ohio incubators consist of a single compartment, with no partition separating the upper part from the lower, and there are no passages or "openings" for carrying air between the lower part of the unit and the upper part (806). The baby's mattress occupies the central portion of the Ohio incubator enclosure, and air is free to move, without restraint, through the entire peripheral region around the mattress (807–808). A definite path of air travel is established in the Air-Shields incubator by the "openings" between the base unit and the occupant's chamber

(DX EE). The air circulation in the Ohio incubators varies greatly with changes in the setting of the humidity control, and with changes in the position (reclining or raised) of the baby's bed. It is in all cases a diffuse air movement not confined to any particular path (804–817, 827–829).

33. Claim 4 of the '240 patent calls for an incubator having an "enclosed base unit" containing the fan, heater, and humidifier with a compartment—inside the base unit and sealed therefrom—which contains an electric motor and other electrical apparatus. The claim recites nothing novel. The elements called for were all present in the original Chapple incubator. The idea of enclosing the possible sources of electric sparks in a sealed compartment was old, having been explicitly taught in the prior-art Armstrong patent No. 2,417,-962 owned by Ohio's predecessor in the incubator business (DX A, Tab 13; 2193–2196). Putting some of the electrical components in a box sealed away from access to oxygen-enriched air amounted to partial compliance with the safety standards of the National Fire Protection Association in force at the time the subject matter of this claim was made (2196–2200; DX A, Tab 28).

34. Quite apart from its lack of novelty, claim 4 of the '240 patent in suit does not aptly describe the accused Ohio incubators, for the reasons detailed in Finding 32, supra. (Claim 4 of the '240 patent, like claim 2 of the same patent, calls for a structure having "an enclosed base unit", lacking in the accused Ohio incubators.)

35. Claim 5 of the '240 patent describes the provision made in Air-Shields' original C-33 incubator for adjustment of humidity; it calls for "a blower-fan, a humidifier unit through which gas from the blower-fan may be passed before reaching the occupant's space, by-pass means and valve means whereby any proportion of gas flowing from said blower-fan may be passed through said humidifier unit". That claimed structure is a conventional arrangement for humidity adjustment which was old in the air-conditioning art, both in the broad sense and specifically in infant incubators. The combination of elements called for by the claim was disclosed in the prior-art Cramer patent No. 1,075,197 (DX A, Tab 1) in the environment of a room air conditioner, and in the Tuttle patent No. 2,084,514 (DX A, Tab 5) in the environment of a gas-conditioning system. The same arrangement was specifically disclosed in an infant incubator in the prior-art Taylor patent No. 2,246,820, the Taylor apparatus differing from that called for by claim 5 only in the immaterial detail that Taylor, instead of using a fan, moved his air by means of a heated convection column, working like a chimney. Claim 5 thus discloses nothing novel or non-obvious (1941–1970).

36. Claim 12 of the '240 patent stands on the same footing as claim 5. The facts noted in the preceding finding are relevant also to claim 12, and claim 12 lacks inventive novelty for the reasons there pointed out (1952–1970).

37. In addition to being devoid of inventive novelty, claims 5 and 12 of the '240 patent fail to read on Ohio's accused incubators, since both claims require a "base unit" separate from the occupant's chamber. As already pointed out (Finding 32, supra), the accused Ohio incubators lack that characteristic.

38. Claim 8 of the '240 patent reads thus.

"8. Incubator apparatus for infants including a separate unit containing circulating and heating equipment, an enclosed occupant's chamber, a surface structure between said unit and said chamber having an inlet opening between said unit and said chamber for directing air into said chamber, an outlet opening for withdrawing air from said chamber, an electrical heating device associated with said circulating equipment, a thermostat for controlling said device located at

the outlet opening in the path of the circulated air stream."

That claim lacks novelty; the precise combination of elements it calls for was disclosed in the prior-art Sittler patent No. 2,098,316 (DX A, Tab 6), with the parts all positioned as specified in the claim. The intended purpose of the Sittler apparatus was to produce artificial fever in an adult patient, whereas the claim speaks of "incubator apparatus for infants". The function of the claimed apparatus was to regulate the heater in accordance with the temperature of the air flowing out of the occupant's chamber. That was done by Sittler in the same fashion as described and claimed in the '240 patent (2393–2405).

39. Claim 10 of the '240 patent is essentially the same in subject matter as claim 4 already dealt with, in that it recites an incubator structure in which the air passing through the occupant's compartment is shielded away from some of the electrical parts constituting possible fire hazards. The facts noted in connection with claim 4 (Finding 33, supra) apply also to claim 10, and they show that claim 10 is devoid of novelty (2498–2502).

## THE '327 PATENT IN SUIT.

40. The '327 patent in suit was applied for in the name of Samuel Y. Gibbon, founder and former president of Air-Shields, and the device disclosed in it is the Air-Shields incubator Model C–35 (132–133). That unit, as noted in finding 12, was the culmination of a redesign effort undertaken after the C–33 model (subject matter of the '240 patent) failed to win Underwriters' approval. The claims of the '327 patent involved in this action are Nos. 6, 8, and 10.

41. Claims 6 and 8 of '327 call for an infant incubator having a machinery compartment so constructed that not only the motor but all electrical connections in the unit are enclosed in a separate box sealed off from the portion of the machinery compartment in which the occupant's breathing air circulates. (But for that one feature, these claims 6 and 8 are fully met (2503–2508, 2514–2518) by the disclosures of the earlier '240 patent.) By reason of the facts already set forth in Findings 33 and 39, supra, these claims 6 and 8 of '327 lack both novelty and invention. Their subject matter was not original with Samuel Gibbon, he derived it from Underwriters Laboratories, which told Air-Shields they would not approve its incubators so long as they had exposed electrical connections in places where oxygen-enriched air might be present (128–131).

42. Claim 8 of '327 does not read on the accused Ohio incubators, for those incubators do not have "an occupant's enclosure supported on a machinery box" nor do they have "a circuitous air duct". Further, they have no "floor member" with "ports". (See Finding 32, supra.)

43. Claim 10 of the '327 patent relates to the orientation of the incubator parts within the machinery box; it reads thus:

"10. For an infant incubator having a separate box containing the temperature control and circulating apparatus, a heat transfer compartment including an air duct and heat transfer devices having heat conducting surfaces positioned along the path of air flow through said duct, said compartment occupying a large part of the volume of said box, and a blower fan having the pressure side thereof connected to said duct and the suction side of said blower fan being located in the portion of said box representing the minor volume thereof."

The structure recited in that claim is not novel. The precise arrangement of components which it recites was disclosed, in another air-conditioning environment, in the Armstrong patent No. 2,236,359 (DX A, Tab 8; also 1977–1981). It did not require invention, or anything beyond mechanical skill, to incorporate that old arrangement in another air-conditioning application, such as an infant incubator (DX D, p. 3; 254–256).

44. In addition to lacking novelty, claim 10 of the '327 patent does not "read" on the Ohio incubators accused of infringing it, since the claim calls for two or more "heat transfer devices" in a "heat transfer compartment". Read in the light of the disclosure of the '327 patent, the word "devices", in the plural, clearly refers to the heater and the ice container, both of which, in the '327 incubator, are in a box situated in the machinery base (PX 2, col. 2, lines 18–24, col. 3, lines 25–67). The accused Ohio incubators do not satisfy that claim requirement, either directly or in terms of equivalents, for they have only one "heat transfer device", the electric heater (1975–1976). In engineering terminology, "heat transfer device" refers to a piece of equipment such as an electric heater or a refrigerator, intended specifically for contributing heat to or withdrawing heat from its environment (1972–1974). The claim language, read in the light of the specification, refers to a device, such as Air-Shields' C–35 incubator, in which both heating and cooling are carried out below deck, and it does not embrace devices like the Ohio incubators which have no cooling means in the heat-transfer compartment.

THE '617 PATENT IN SUIT.

45. The '617 patent in suit (PX 3), granted to Air-Shields in the name of Samuel Gibbon as "inventor", is the patent already mentioned (Findings 14–15, supra) which discloses and claims the "Croupette" nebulizer as mechanically modified to fit Air-Shields' infant incubators (350–358).

46. The '617 nebulizer is substantially the same device, apart from "mechanical configuration", as the one disclosed in the old Gibbon patent No. 2,624,337 (356–358, 3136). Whatever claim to patentable novelty Air-Shields can make for the '617 patent must therefore rest on the small differences that did exist between the two devices. Primarily, they consisted (a) of reorienting the nebulizer's inlet port so that it was directly alongside the outlet port, rather than being beneath it, as in the earlier model, and (b) of mounting spring clips on the inlet and outlet ports to permit their being clipped into a pair of access holes already provided in one of the side walls of Air-Shields' incubators (356–358). Neither of those mechanical changes contributed any new function to the nebulizer; they were routine obvious modifications of one old device (the Croupette nebulizer) to provide a mechanical fit with the Air-Shields incubator, another old device (769–804).

47. The claims in suit of the '617 patent are Nos. 1 and 6. The subject matter of both claims is devoid of inventive novelty, for the reasons just set forth. Further, neither of those claims reads on the accused Ohio nebulizers:

(a) Specifically, claim 1 calls for "a pair of parallel vertical duct members, each having an elbow at the upper end thereof", one of said duct members containing "an atomizer unit". Also the claim demands "a clip device connected to the upper end of each duct adjacent the terminal opening thereof". The accused Ohio nebulizers have none of those structural features (769–804).

(b) Claim 6 of the '617 patent requires "a pair of vertical ducts, each having an elbow at its upper end", an "atomizer positioned in a zone adjacent the lower end of one duct", a "flow channel between the lower ends of said ducts", and "means for controlling the amount of returned gas". None of those features is present in the accused Ohio nebulizers (769–804).

THE '713 PATENT IN SUIT.

48. The '713 patent in suit discloses the mechanical structure of the Air-Shields incubator designated Model C–86, first marketed in October, 1963 (3203, 3207). The persons named in the patent as its inventors are James R. Grosholz and John D. Wallace,. both of whom were Air-Shields engineers who worked on the development project which culminated in the C–86 incubator. While

the '713 patent contains claims addressed to a variety of the mechanical features of the incubator described in its specification, the claims here in suit, Nos. 13, 14, and 16, relate to only two of them— namely, the use of low-surface-temperature heater and the provision of door latches that may be elbow-operated.

49. Claim 13 of '713 reads thus:

"13. An incubator comprising a base with air chambers therein including an air warming chamber, an infant support above the base, a hood surmounting the base and adapted to enclose the support with an infant thereon, means providing for circulation of air from the hood through the warming chamber and again into the hood, and a heater in the warming chamber, the capacity of the circulation means and the heat flux of the heater being such as to maintain a heater surface temperature below 300° F."

Everything in the quoted claim is conventional—was present in the original 1948 Grieb-designed incubator of the '240 patent—except the final recital, stating that " * * * the capacity of the circulation means and the heat flux of the heater being such as to maintain a heater surface temperature below 300° F." The claim lacks inventive novelty unless it constituted patentable invention on the part of Air-Shields' named inventors Grosholz and Wallace to use, in an infant incubator, a heater with maximum surface temperature less than 300° F. The ultimate facts on that point, are (a) it was not novel to use such a heater in an infant incubator (Finding 55, infra; DX A, Tabs 35 and 39; and DX P, Sheet 4); and (b) the concept of using such a heater in an isolation incubator was not original with Air-Shields; it was communicated to Air-Shields by a pair of U. S. Army physicians named Mendenhall and Jenicek (Findings 50–56, infra).

50. The reason an incubator's heater-surface temperature is important is that ether, when heated above about 300° F., may decompose into formaldehyde, a poisonous gas. In consequence, a dangerous situation exists whenever ether is present in an incubator of the isolation type, in which the baby's breathing air is recirculated. This may occur when an isolation incubator is employed for post-surgical care of a baby that has had ether anesthetic. A baby may, under those circumstances, exhale ether during the postoperative period; and the ether, on being recirculated through the incubator heater, may decompose and form formaldehyde. (Mendenhall-Jenicek paper, J.A.M.A., June 11, 1960, DX A, Tab 38).

51. As early as 1955 Air-Shields became aware that ether decomposition presented a health hazard in the use of its incubators, having been told of the problem by hospitals abroad (193–196, 318, 912). Air-Shields did nothing about the matter at that time, however, except to put notices in its instruction books and incubators warning users against putting in the incubator a baby who had been anesthetized with ether (912–914).

52. In the Journal of the American Medical Association, issue of June 11, 1960 (DX A, Tab 38), a paper was published under the title "Thermal Decomposition Of Ether In The Infant Incubator", by U. S. Army physicians Max K. Mendenhall and John A. Jenicek. That paper recorded the authors' observation that ether exhaled by an incubated infant during recovery from anesthesia could be decomposed by contact with the electrical heating element in the incubator, and reported extensive experiments with animals which showed that the "major product" of such ether decomposition was formaldehyde. The paper's summary, printed in a box on the first page, concluded with this sentence:

"The production of such irritants can be avoided with use of a heater so designed that the gases in the incubator do not come into contact with heating elements at high temperatures."

This was the first recognition on the part of anyone that the ether-decomposition problem could be solved. It is the

**684**

earliest teaching from any source that the problem could be solved by using low-temperature heaters in infant incubators.

53. The Mendenhall-Jenicek delineation of the ether-decomposition problem and its solution was widely circulated, not only in the medical press but in "Fire News", a publication of the National Fire Prevention Association. In that periodical the Mendenhall-Jenicek recommendations were paraphrased thus (DX A, Tab 43):

"The recommendations of this group, which affect the design of incubators that may be used for post-anesthesia recovery, essentially involve the enclosure of the heating elements in such a manner that warmed surfaces exposed to the atmosphere of the incubator will not exceed 120 degress Centigrade or 248 degrees Fahrenheit."

54. Plaintiffs' expert witness conceded (854, 2977) that the quoted passage from the Mendenhall paper is "senseless in any context other than an isolation incubator such as the [Air-Shields] Isolette or the Armstrong."

55. After the Mendenhall-Jenicek paper was published, Air-Shields followed the authors' suggestion that the ether-decomposition hazard could be avoided by using a heater so designed that the recirculating gases would not encounter high temperatures. Dr. Cullumbine, then Air-Shields' president (886), instructed his employees to determine the precise temperature at which ether decomposition starts, pointing out that the Mendenhall paper indicated only that it occurred somewhere between 248° F. and 302° F. (DX B). Thereupon the Air-Shields engineers made tests, using the experimental procedures taught in the Mendenhall paper, and concluded that 300° F. was a safe temperature for the surface of the heater (DX B; 915–916). Concurrently with that experimental work, Dr. Cullumbine ordered that a survey of competitive incubators be made to determine what surface temperatures they had (916–917). Such an investigation was conducted, and its results—

duly reported to Dr. Cullumbine (DX P, Sheet 4)—showed that one incubator then on the market, known as the "Penn 600", already had a heater which operated at a temperature of 250° F. All the other competitive incubators exhibited heater temperatures above 300° F.

56. The work summarized in the preceding finding took place in 1962, and it was followed by development work directed to designing a heater for Air-Shields new-model incubator that would perform satisfactorily without developing a surface temperature higher than 300° F. (916, 921–922). It was the sort of job any mechanical engineer with a bachelor's degree should be able to perform (1987–1988).

57. By June, 1963, the new Air-Shields incubator equipped with a low-temperature heater (Model C–86) was ready for introduction to the trade. Air-Shields, in coaching its salesmen on selling the new product, freely gave credit to Mendenhall et al. for the low-temperature feature, saying of the Mendenhall paper (DX AA):

"It was written by Mendenhall and associates at Booke Army Hospital near San Antonio, Texas. It reported ether pyrolysis producing potentially lethal concentrations of formaldehyde gas. They recommended the possibility of a lower temperature heating unit and it's been done in the C–86."

58. In dealing with the Patent Office, however, Air-Shields did not cite the Mendenhall paper to the attention of the Patent Office, nor did it acknowledge that the idea of using a low-temperature heater had come to it from the medical profession. On the contrary, it pretended that its own "inventors" Grosholz and Wallace had conceived the idea for themselves. In the original application on which the '713 patent in suit issued, the provision of a low-temperature heater was stated to be an "important object of the present invention" (DX VV, p. 2); and the claim which ultimately became claim 13 in suit was presented as application claim 20 (DX VV, p. 26). It was initially rejected as obvious in view of

the prior art (DX VV, p. 39); but Air-Shields persisted in urging its allowance, stressing the element of the claim calling for a heater temperature below 300° F. and asserting (DX VV, p. 50) that "there is nothing in the art suggesting that feature." Nonetheless, the low-temperature heater claim was again rejected as obvious (DX VV, p. 72)·. Air-Shields once more urged its allowance, making this argument (DX VV, pp. 82–83; emphasis added):

> "The rejection of Claim 20 on any of the art cited is not understood. Applicants have *found* that in order to avoid highly undesirable decomposition of ether, with consequent formation of formaldehyde, in instances where the infant in the incubator has been subjected to ether anesthesia, a heater system with low surface temperature on the heater element is important. *The prior art does not even point out the hazards or the problem and certainly teaches nothing with reference to the solution to that problem.*"

The Patent Office thereupon withdrew its rejection, allowed the application, and granted the low-temperature claim, now claim 13 of the '713 patent.

59. The argument made to the Patent Office, quoted in the foregoing finding, was false in three respects—(1) it credited Air-Shields' "inventors" Grosholz and Wallace with having "found", i. e., discovered for themselves, the facts about ether decomposition and its relation to heater temperature; (2) it stated that the "prior art does not even point out the hazards or the problem"; and (3) it stated that the prior art "teaches nothing with reference to the solution" of the ether-decomposition hazard. There is no evidence in the record that Air-Shields' patent solicitor, who actually wrote the argument under consideration, was aware that the representations he was making were false. Numerous persons at Air-Shields, including the "inventors" Grosholz and Wallace, knew what the true facts were, however, for they were all thoroughly familiar with the Mendenhall paper and knew that it had inspired the low-temperature heater development program at Air-Shields (DX B). Wallace, moreover, had repeated conferences with Air-Shields' patent solicitor concerning the prosecution of the '713 application throughout the period in which it was pending; whenever an amendment was going to be filed, the solicitor would consult Wallace and Grosholz about it (3082–3083). This practice continued even after Wallace had left Air-Shields and shifted to another job (3083).

60. The early history of the present litigation shows that Air-Shields, until events forced it to do otherwise, tried to conceal from the Court and defendant the fact that its low-temperature heater "invention" had been inspired by the Mendenhall paper. Thus, on being asked by an interrogatory to identify all documents in its possession discussing or referring to the Mendenhall paper or its contents, Air-Shields answered under oath (3234–3235) that it had "no correspondence, memoranda or other documents which discuss or refer to" the article or its contents. (Air-Shields in fact had many such documents in its possession, a number of which (DX B, X, Y, AA, BB) are now in this record as exhibits.)

61. The facts set forth in the foregoing Findings Nos. 50–60 not only establish the ultimate facts found in Finding 49 foregoing; they show, and the Court hereby finds, that the Patent Office grant of claim 13 of the '713 patent in suit, purporting to monopolize isolation incubators having low-temperature heaters (1672–1674), was induced by misrepresentations of fact respecting matters well known to at least some of plaintiffs' officers and, specifically, well known to its alleged "inventors" Grosholz and Wallace.

62. The other two claims of the '713 patent involved in this action are Nos. 14 and 16, both of which relate to incubators having access doors equipped

with elbow-operable latches. Claim 14 is illustrative; it reads thus:

"14. An incubator comprising a base having an infant support, and a box-like hood surmounting the base and adapted to enclose an infant resting on the support, the hood having an arm port through a side wall, a door for closing the port, and a hinge for the door having a hinge axis providing for lateral swinging movement from closed to open position, a releasable door latch having an operating push button operable by the elbow to release the latch, and spring means acting on the door to urge the door toward open position."

63. Neither claim 14 nor claim 16 of the '713 patent in suit describes anything of an inventive character. Infant incubators having laterally swinging access doors were old (Cuvier French patent, DX A, Tab 20); and it was an obvious expedient to provide such doors with spring hinges and elbow-operable latches in view of the widespread use of such devices, in the prior art generally and in hospitals particularly (728–732, 945–946; DX A, Tabs 2, 4, and 14). That Air-Shields' "inventors" Grosholz and Wallace did nothing of a creative or inventive nature in respect to the subject matter of claims 14 and 16 of '713 is confirmed by the fact that they did not even originate the idea of an incubator with elbow-operable door latches. That suggestion came to Air-Shields from its export sales manager MacInnes (945–946), who in turn got it from nurses in the hospitals (2907–2909). Moreover, the idea had been suggested to Air-Shields years before by an outside consultant (DX CCC, p. 3).

64. The '713 application, as filed, did not contain any claim directed to, or even mentioning, the elbow-operated door latch (DX VV, pp. 21–26), nor was that subject mentioned among the objects of the "invention" (DX VV, pp. 1–3). The first claims that dealt with that subject were introduced by amendment filed September 23, 1966 (DX VV, pp. 42–44), almost three years after their

subject matter (Air-Shields' Model C–86) had been on sale and in public use in this country (3203). Those facts are significant for two reasons. They show that equipping an incubator with elbow-operable door latches was not originally thought by Grosholz and Wallace to be something they had invented, since they disclosed it in their application without claiming it or mentioning it as an object. Further, it establishes that claims 14 and 16 are within the statutory bar of 35 U.S.Code, § 102(b), their subject matter having been on sale and in public use in this country for more than one year prior to the date that claims directed to such subject matter were first filed in the Patent Office.

65. No finding numbered 65.

THE '233 PATENT IN SUIT

66. The '233 patent in suit was applied for by Air-Shields in the names of James R. Grosholz and Christian B. Andreasen; it relates to a circuit used in Air-Shields' servo-control incubators. The claims alleged to be infringed are Nos. 5, 7, 8, 9, 10, 11, and 12. Defendant pleads (a) that all of those claims are invalid for lack of invention, (b) that all of those claims except claim 5 are invalid because they are barred by the provisions of 35 U.S.Code Sec. 102 (b), their subject matter having been first claimed more than one year after it was on sale and in public use in this country, and (c) that none of such claims except claim 7 is infringed, even if held valid.

67. The disclosure of the '233 patent can be best understood if one first recalls that prior to the advent of "servo control" the air temperature of an isolation incubator was regulated by a thermostat set at a target air temperature selected by the attending physician. When the air temperature reached the target value, the thermostat would switch off the heater, and it would stay off until the air temperature dropped sufficiently to make the thermostat switch the heater back on. Thus temperature control in a pre-servo isolation incubator

was accomplished in much the same way as in a home heating system, where a wall thermostat "cycles" a furnace to maintain the air temperature at a desired value. There was, however, one important difference, noted in the next finding.

68. The big difference between the temperature-control problem in an incubator as opposed to a home is that in the incubator measures had to be taken to insure against overheating should the regular thermostat fail, for a baby can neither correct the fault nor escape from the hostile environment thus created. Dr. Chapple understood this, and he provided in the original Chapple incubator a safety thermostat whose only function was to turn off the heater and sound an alarm should the temperature rise above a safe level for any reason whatever (DX A, Tab 9, p. 4, col. 2, line 58, to p. 5, col. 1, line 16). That so-called "safety thermostat" did not operate so long as everything else worked normally. A safety thermostat was incorporated in every Air-Shields incubator sold before the advent of servo control (691, 697–698) and in Great Britain the "British Standards", since 1958 or earlier, have required that such a device be included in every infant incubator (DX HH, pp. 12–13).

69. When Air-Shields first tried to get away from the high cost and complexity of Dr. Silverman's servo control with radiant-energy heaters, it eliminated the radiant-energy devices and replaced the conventional air-responsive thermostat with a body sensor (555, 930), which turned the regular air heater on and off in accordance with the temperature of the infant (551–556, 733–737, 993–997). Such an air-heater servo control is illustrated in Fig. 13 of the '713 patent in suit, and described in the '713 specification, column 8, lines 32–48.

70. In using that original air-heater servo arrangement, Air-Shields found that during the initial warm-up period, after a cold infant was first placed in the incubator, the body-responsive sensor would call for heat continuously, with the result that the air temperature would rise to the set point of the safety thermostat (860). Thereupon the safety thermostat would turn off the heater and sound an alarm, even though no actual emergency had occurred (928–931). In other words, the safety thermostat, traditionally inoperative except when something else went wrong, was performing a function in the normal operation of the incubator—namely, to prevent overheating of the air during the baby's warm-up period. This impaired the safety function of the thermostat and caused consternation at Air-Shields, for the hospitals that bought its incubators wanted no "false alarms" (930–932).

71. The "false alarm" problem was solved by restoring the safety thermostat to its traditional inactive role and installing a separate air thermostat to hold the air temperature within proper bounds. In doing that, the Air-Shields engineers followed the teaching of the Sittler and Adams-Ray prior-art patents (DX A, Tabs 6 and 18; 3018–3019, 3033–3034).

72. Until Air-Shields thus adopted a circuit using both a body sensor and an air thermostat—separate from the safety thermostat—to control the air heater, it continued to be plagued with "false alarms" caused by unwanted operation of the safety thermostat. Its engineers meanwhile tried to alleviate the problem with schemes for temporarily disabling the alarm system while the baby's body was warming up to target temperature (930–933, 991–995). Air-Shields even brought out a commercial incubator with a push-button timer on it with which the high-temperature alarm could be switched off during warm up (1827–1828). That unit had only a short commercial life in the United States, however (993–997), and was never marketed in Great Britain, because Air-Shields and its British representative knew it could not pass the British Standards (931–932, 1823–1824, 1827–1828).

73. The circuit finally adopted for Air-Shields' Model C–86 servo-control incubator eliminated the alarm-disabling

timer and incorporated three temperature-sensing elements—a body sensor, a regular air-temperature thermostat, and a true safety thermostat which did nothing so long as the other components worked normally (991–995). Incubators with that circuit did meet the British Standards and were sold in Great Britain (1828–1829, 2845–2879).

74. In that C–86 incubator, the regular air thermostat had a knob for adjusting its target temperature, and a switch was mechanically coupled to the thermostat in such fashion that turning the knob all the way to the right would set the air thermostat at its maxim operating temperature and would, at the same time, switch on the body sensor. Thus it was assured that when servo control was in use the air temperature could not rise above the highest set point of the air thermostat (1558–1563).

75. A patent application (DX FF) showing the servo-control circuit just described was filed on March 19, 1964, in the names of Air-Shields' engineers James R. Grosholz and Christian B. Andreasen. All the claims in that application except claim 5 were restricted to the mechanical arrangement by which a single knob controlled both the regular air thermostat and the servo switch (DX FF, pp. 12–14). The Patent Office allowed that application on October 3, 1966 (DX FF, p. 26), but it never issued as a patent; the reason was that in late 1966 Air-Shields saw Ohio's new servo-control incubator and realized that the claims in the allowed application would not "read on" it (3169–3180). Air-Shields held a conference (3169–3174), a new set of claims was written, broader than any previously submitted to the Patent Office (3175–3180), and they were embodied in a new application filed December 28, 1966 (DX WW). The new application was aggressively prosecuted (DX WW, pp. 26–32); and it matured on August 29, 1967, into the '233 patent in suit.

76. The '233 claims alleged to be infringed by Ohio's products are Nos. 5, 7, 8, 9, 10, 11, and 12. Of those, only claim 5 was in the original Grosholz-Andreasen application of 1964 (DX FF); all the others are addressed to subject matter first claimed in the second application. Its filing date—December 28, 1966—was more than three years after incubators embodying the subject matter of the newly presented claims went on sale and into public use in this country (3203).

77. Claim 5 of '233 reads thus, with numerals inserted to designate the various elements called for:

"5. In an incubator having an air circulation system and a heater element for heating the air in the incubator, a control system for the heater element comprising [1] a heater control circuit incorporating a limiting thermostat for controlling the heater element, the limiting thermostat being exposed to the air in the circulation system of the incubator and being responsive to air temperature to establish an air temperature limit in the incubator, [2] a device responsive to the temperature of the occupant for controlling the heater, [3] an adjustable device responsive to the incubator air temperature and providing for adjustably limiting the air temperature to a range below the temperature limit provided by the limiting thermostat, [4] connectors providing for series connection of the limiting thermostat and said devices with the heater element, and [5] switch means providing for by-passing the said device responsive to the body temperature of the occupant."

That claim defines nothing novel or inventive. Every element it calls for was disclosed, in the same circuit relationship specified by the claim (3018–3019), in the Sittler patent No. 2,098,316, Sittler's element 84, described as a "safety fuse", being his counterpart to the safety thermostat of the '233 incubator (DX A, Tab 6, p. 3). The Sittler apparatus was an artificial-fever machine intended for regulating the body temperature of an occupant. It would have required nothing more than engineering common

sense for a skilled artisan familiar with the Sittler circuit to use it in a baby incubator. Once a doctor has specified the conditions of temperature and humidity which should prevail in an incubator, the task of making the incubator conform to those specifications is an engineering problem, not a medical problem (2460–2461).

78. The evidence shows that Sittler's "safety fuse" (DX A, Tab 6, p. 3) was the equivalent of the "safety thermostat device" which Dr. Chapple used in his original isolation incubator (DX A, Tab 9, p. 4) and included as a conventional element in later isolation incubators (3003–3014). Not all designers of isolation incubators elected to use the thermostat type of safety device; the Higgs prior-art patent No. 2,633,842 shows such an incubator with a fuse for protection against excessive temperature in the circulating air stream (DX A, Tab 16, col. 3; and see 3009). The goal, whichever device was used, was to insure that the heater would be turned off if the temerature exceeded a critical limit, and both devices accomplished that result (3005, 3014).

79. The Sittler patent was cited by the patent examiner as a ground for rejecting this claim 5, as well as the other claims alleged to be infringed, and Air-Shields' solicitor conceded its relevance (DX WW, pp. 24, 31). However, he persuaded the examiner to allow the claims over the Sittler reference by arguing (a) that the fuse which Sittler used as his safety thermostat was not exposed to the circulating air and (b) that the fuse's indicated "blowing" temperature of 270° F. showed it was not intended to do what the safety thermostat of the '233 patent did—namely, to prevent the air from exceeding a temperature which the occupant could safely tolerate (DX WW, p. 32). The proof in this record shows that both those arguments were ill-founded, and that the patent examiner's original rejection of '233 as unpatentable over Sittler was correct. The facts are: (a) A temperature of 270° F. is a realistic set point for the limiting thermo-

stat in an artificial-fever machine for adults, since human beings can survive without injury temperatures far exceeding 270° F. (2456–2457); and (b) the text of the Sittler specification does teach a skilled reader (2458–2459) that the purpose of the so-called "safety fuse 84" was to set a safety limit for the air temperature in the cabinet.

80. Claim 5 of '233, moreover, defines nothing inventively novel over the disclosures of Adams-Ray (DX A, Tab 18) or Clark (DX A, Tabs 21 and 22). What claim 5 calls for (3033–3034) is conventional prior-art apparatus, as illustrated by the Adams-Ray or Clark systems, plus a conventional safety thermostat of the sort taught in Dr. Chapple's 1941 patent (DX A, Tab 9) and required by the British Standards (DX HH, pp. 12–13). In the '233 apparatus, the function performed by the safety thermostat is its usual one (1689–1695), so adding it to the Adams-Ray or Clark apparatus was mere aggregation of two old devices. This record shows that nothing could be more obvious than to include a safety thermostat in any baby incubator, whatever the remainder of its circuit might have in it (DX HH, pp. 12–13; DX A, Tab 9, p. 3; and see 243, 691–692, 697–698, 931–932, 995–997, 1689–1695, 1826–1830, 2841, 3005–3017).

81. The Adams-Ray patent was cited by the Patent Office in the prosecution of the '233 patent but was not specifically applied as a basis for claim rejection (DX WW, pp. 23–25). This is understandable, since the Adams-Ray machine, while virtually identical to that of '233 in mode of operation, did not include a safety thermostat or any equivalent (2581). All the '233 claims except claim 12 recited as an element of the claimed combination a safety thermostat (called, in the claim language, a "limiting thermostat" or a "device * * * acting to give a warning signal"). The Sittler machine did have such a device and was hence a better reference against the '233 apparatus claims than was Adams-Ray. Moreover, the Patent Office did not have before it the evidence

**690**

in this record demonstrating that the safety thermostat, from a date long before '233 was applied for, has been a conventional component of infant incubators (243–245, 698), required by British Standards (DX HH, pp. 12–13). Nor did the Patent Office have before it the admissions in this record on the part of Air-Shields' witnesses that the safety thermostat is a wholly aggregative component of an incubator, performing no function except when something else fails and, even in that event, acting alone rather than in cooperation with other components (Gibbon, 243; Silverman, 698; Lusted, 1689–1695; Grosholz, 2841).

82. Apart from the facts showing lack of novelty in the '233 patent's claim 5, that claim does not aptly describe the Ohio incubators accused of infringing it. Thus:

(a) The claim requires that the "adjustable" air thermostat be connected in series with the limiting thermostat and the body sensor; the accused Ohio incubators are not so constructed. Rather than the series connection which claim 5 calls for, the Ohio incubators have alternative branch circuits, the adjustable thermostat being in one branch, the body sensor being in the other branch, and the safety thermostat being common to both branches (PX 49; DX LL–1). A switch is provided for cutting in one branch circuit or the other, at the operator's will, but at no switch setting is the adjustable thermostat in series with the body sensor, nor do they ever both work at the same time (1717–1730). When the body sensor is in the circuit, the warm-up air temperature is governed by a special air-responsive thermostat, referred to in Ohio's instruction manual (PX 19, p. 8) as the "servo safety thermoswitch". The operating point of that thermostat can be changed with a screwdriver, but it is not "adjustable" in the sense of the '233 patent—i. e., controllable by an attendant by means of a "hand knob" (2693–2695).

(b) Claim 5 requires "switch means providing for by-passing" the body sensor; the accused Ohio incubators have no such device (1718, 1723). What the quoted recital means, in the light of the '233 specification, is a switch which, in one position, will cut the body sensor out of the circuit and hence allow the heater to be governed solely by the adjustable air thermostat, and, in another position, will connect the adjustable thermostat and the body sensor in series so that both cooperate in controlling the heater—and hence the air temperature. In the Ohio incubators, as noted in subfinding (a) above, the body sensor and the adjustable thermostat never function at the same time, and the switch does not perform the by-passing function recited in claim 5 (1717–1730, 3029).

83. That claim 5 of '233 does not aptly describe the Ohio servo control was tacitly admitted by Air-Shields when the Ohio product first appeared; it was that very fact which caused Air-Shields to prepare and file the substitute application containing broadened claims. (See Finding 75, supra.) Air-Shields' present contention that claim 5 covers the Ohio servo control incubators is an afterthought, without merit (3169–3180).

84. Claims 7, 8, and 9 of '233 will be dealt with collectively, since they constitute a group. Claim 7 reads thus:

"7. In an incubator having an air circulation system and a heater for heating the air in the incubator, a control system for the heater comprising a limiting thermostat for controlling the heater, the limiting thermostat being exposed to the air in the circulation system of the incubator and being responsive to the air temperature to establish an air temperature limit above which the heater does not operate to heat the air in the incubator, a control device responsive to the temperature of the occupant for controlling the heater, another device for controlling the heater exposed to the air in the circulation system and being responsive to the air temperature to es-

tablish, under normal operating conditions, a normal air temperature in the incubator below the air temperature limit established by the limiting thermostat, and a heater control circuit connecting the limiting thermostat in series with each of said devices."

Claim 8 calls for the apparatus of claim 7 plus a by-passing means for the occupant-responsive device; while claim 9 adds to claim 7 recitals calling for the by-passing means and requiring the air-responsive device to be adjustable in a temperature range below the set point of the limiting thermostat.

85. Claims 8 and 9 call for the same array of elements as claim 5. The facts set forth in Findings 77–81, supra, hence apply to them and show their subject matter to be neither novel nor inventive. The same is true of claim 7, which is even broader than claims 8 and 9. Claims 8 and 9 do not describe the accused Ohio incubators, as shown by the facts noted in Finding 82, supra. Moreover, claims 7, 8, and 9, as well as claims 10, 11, and 12, are subject to the statutory bar of 35 U.S.Code, § 102(b), being broader in scope than any claim presented in the 1964 patent application and having been first presented to the Patent Office more than one year after their subject matter went on sale and into public use in this country. (See Findings 75–76, supra.)

86. Claims 10 and 11 of '233 describe the disclosed heater-control circuit, with the proviso that the set point of the air thermostat must be at a temperature below the set point of the body sensor. That mode of operation is not characteristic of the accused Ohio incubators. On the contrary, Ohio's instruction books have always specified that the "servo safety thermoswitch" (i. e., the fixed air-temperature thermostat which operates in the servo-control mode to prevent overheating during warm-up) should be permanently set at a temperature above the operating range of the body sensor (2561–2565, PX 19). Hence claims 10 and 11 do not read on the accused Ohio servo-control incubators. Moreover,

claims 10 and 11 lack inventive novelty in view of the Sittler and Adams-Ray disclosures already mentioned, the selection of set points for the air and body thermostats being a matter of choice without inventive significance. (At the trial, it was shown that the thermostats in Ohio incubators can, with tools, be caused to exhibit the set-point relationship called for by claims 10 and 11. Such an operating mode is contrary, however, to the specific operating instructions issued by Ohio to its customers; and it is therefore irrelevant.)

87. Claim 12 of the '233 is a method claim reading thus:

"12. In the operation of an infant incubator having an air heater, the method which comprises warming up an infant placed in the incubator by sensing the temperature of the air in the incubator and by cycling the operation of the heater in accordance with the sensed fluctuations of the air temperature above and below a first predetermined temperature until the infant's temperature rises to a second predetermined temperature above said first predetermined temperature, and thereafter maintaining the infant's temperature by sensing the fluctuations of the infant's temperature and by cycling the heater in accordance with the sensed fluctuations of the infant's temperature above and below said second predetermined temperature."

That claim defines nothing novel or inventive. Apart from the set points, it reads directly, word for word, on the method of "body tempering" taught in the Adams-Ray prior-art patent (DX A, Tab 18; DX LL–7; and see 2567–2581). The claim's only distinction from Adams-Ray's method lies in its recital that the set point of the air thermostat is at a lower temperature than that of the body sensor. In that respect, the Ohio incubators are like Adams-Ray, so any interpretation of claim 12 that would make it embrace the Ohio incubators would render it fully anticipated by the Adams-Ray method.

88. All the '233 claims in suit except claim 12 exhibit the defect of aggregation, in that they claim an assemblage of heater-control components in conjunction with a safety thermostat which is an old, conventional element that performs no cooperative function with any of the other elements of the claimed device. That fact, admitted by several of plaintiffs' witnesses, is confirmed by the language of claim 12, which recites the method or mode of operation of the '233 "invention" without referring either to the safety thermostat or its function (691–692, 995–997, 1689–1695, 2841).

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and over the subject matter of the action.

2. United States patent No. 2,600,240 is owned by plaintiff Children's Hospital of Philadelphia and exclusively licensed to plaintiff Air-Shields, Inc. Claims 2, 4, 5, 8, 10, and 12 of that patent are invalid for want of patentable invention over the prior art. Additionally, claims 2, 4, 5, and 12 have not been infringed by defendant. Further, enforcement against defendant of said patent No. 2,600,240 is barred by laches and estoppel arising from plaintiffs having inexcusably slept on their rights in respect to such patent for eight years prior to commencement of this action.

3. United States patent No, 2,648,327 is owned by plaintiff Children's Hospital of Philadelphia and exclusively licensed to plaintiff Air-Shields, Inc. Claims 6, 8, and 10 of that patent are invalid for want of patentable invention over the prior art. Additionally, claims 8 and 10 of such patent have not been infringed by defendant. Further enforcement against defendant of said patent No. 2,648,327 is barred by laches and estoppel arising from plaintiffs having inexcusably slept on their rights in respect to such patent for eight years prior to commencement of this action.

4. United States patent No. 2,778,617 is owned by plaintiff Air-Shields, Inc. Claims 1 and 6 of that patent are invalid for want of patentable invention over the prior art. These claims have not been infringed by defendant. Further, enforcement against defendant of said patent No. 2,778,617 is barred by laches and estoppel arising from plaintiff Air-Shields, Inc. having inexcusably slept on its rights in respect to such patent for a period of eight years prior to commencement of this action.

5. United States patent No. 3,335,713 is owned by plaintiff Air-Shields, Inc. Claims 13, 14, and 16 of that patent are invalid for want of patentable invention over the prior art. Further, claim 13 of said patent is invalid and unenforceable because its grant by the Patent Office was induced by misrepresentations made in behalf of plaintiff Air-Shields, Inc. as to the state of the prior art, the truth in that regard having been well known to the officers and key employees of plaintiff Air-Shields, Inc., at the time such misrepresentations were made. Claims 14 and 16 of said patent are invalid and unenforceable for the further reason that their subject matter was falsely represented to the Patent Office to be the joint invention of James R. Grosholz and John D. Wallace. Said claims 14 and 16 are also invalid by virtue of 35 U.S.Code, § 102(b), such claims having been first presented to the Patent Office more than one year after their subject matter was on sale and in public use in this country.

6. United States patent No. 3,338,233 is owned by plaintiff Air-Shields, Inc. Claims 5, 7, 8, 9, 10, 11, and 12 of that patent are invalid for want of patentable invention over the prior art. Further claims 7, 8, 9, 10, 11, and 12 of said patent are invalid by virtue of 35 U.S.Code, § 102(b), such claims having been first presented to the Patent Office more than one year after their subject matter was on sale and in public use in this country. None of claims 5, 8, 9, 10, 11 and 12 of said patent have been infringed by defendant.

7. The causes of action for patent infringement alleged in the complaint are without merit, and the complaint must therefore be dismissed for want of equity, with costs to defendant.